JOURNAL ENTRY AND OPINION
Marvin Dearing appeals from a judgment of the common pleas court entered pursuant to a bench trial finding him guilty of the murder of Regina Jackson. On appeal, he raises five assignments of error for our consideration: he challenges the court's viewing of the scene, alleges prosecutorial misconduct, raises claims regarding the sufficiency and weight of the state's evidence, and challenges the effectiveness of his counsel, the court's rulings as to discovery, and its failure to grant a new trial. After careful review, we reject these contentions and affirm the judgment of the trial court.
The history of this case reveals that on December 31, 1999, Regina Jackson, her fiance Donald Mynatt, and two family members went to the Glen Cove Lounge at East 156th Street and Pythias Avenue, Cleveland, to celebrate New Year's Eve. Around 11:25 P.M., she left the bar to go to a B.P. gas station located at East 152nd Street to buy a new pair of pantyhose because hers were torn. Not finding any pantyhose in the store at the gas station, Jackson purchased a cup of coffee and left to return to the bar.
At 11:55 P.M., Christian Davis, a resident on the second floor of an apartment building adjacent to the Glen Cove Lounge, heard gunshots coming from the direction of Corsica and East 156th Street. He looked out of his window and saw what he recognized as a 1989 blue Buick Skylark, with a thirty-day tag in the center of the rear window, parked in the middle of the street, next to his own car. He saw a black man dressed in all black exit the driver's side, leave the car door open, and walk to the back of the Buick with what appeared to be a towel wrapped around his hand, and then he saw that man fire between six to eight shots at an object Davis could not see. The individual got back into his car and sped off. When Davis went downstairs, he learned that a woman had been shot. Meanwhile, Mynatt, still waiting at the bar for Jackson's return, saw flashing lights outside the bar, went outside and saw her body lying across the front seat of her daughter's white Ford Escort, its glass shattered. Cleveland Police Sergeant Kilbane arrived at the scene to investigate and spoke with Davis, who related to him what he had witnessed regarding the shooting.
The next day Detective Hall, an off-duty Cleveland Police Officer who worked security at Dave's Supermarket in Cleveland, upon being alerted by a cashier that a male had left the store without paying for groceries, overtook the male, returned him to the store, and requested payment. The male then paid for the groceries and left. Detective Hall watched as the male got into a blue Buick Skylark with a temporary tag located in the center of the rear window and realized that the vehicle matched the description of the car involved in the homicide the previous night. He wrote down the temporary licence number and reported it to the Cleveland Police Department Homicide Unit, which determined the owner to be Marvin Dearing.
On January 3rd, 2000, Detective Garisek, a member of the Cleveland Police Department Homicide Unit, went to Dearing's residence in connection with the homicide investigation. He observed Dearing walk towards a blue Skylark Buick with keys in his hand. As Detective Garisek approached Dearing and asked him about the Buick, Dearing ran. Detective Garisek apprehended him and read him his Miranda warnings; at first, he gave his name as Antonio Robinson and denied knowing a Marvin Dearing. During subsequent questioning, he stated that he had been at his girlfriend's house all night on New Year's Eve, but later stated that he left his girlfriend's house around 11:00 P.M and went to visit his mother until 11:45 P.M. He claimed that he then went to a store to purchase champagne and returned to his girlfriend's house around midnight. He further stated that no one had used his vehicle that evening.
Detective Lucey, a member of the Association of Firearm and Toolmark Examiners, examined the seven spent shell casings found at the crime scene and determined that the shell casings were Sellier and Bellot (SB) brand, nine millimeter short, with a red-colored sealer on the back of each casing. He also examined the two spent pellets removed from the victim's body and found them to be fired by the same weapon as the shell casings.
Detective Lucey in addition examined four live rounds of ammunition, found by the police at Dearing's residence pursuant to a search warrant, and also determined them to be nine millimeter SB short rounds of ammunition with a red sealer mark on the back of each round.
The grand jury indicted Dearing for aggravated murder with a firearm specification, and for having a weapon while under a disability. Dearing waved his right to a jury trial and a bench trial followed.
At trial, the state called Richard Ware, who resided on Corsica Avenue, adjacent to Pythias Avenue, and who had known Dearing for several years. He testified that around 11:00 P.M. on December 31, 1999, he saw Dearing, in a Buick Skylark with a thirty-day tag, driving past his house. He also testified that he observed Dearing stick his left hand out of the driver's side window and shoot a gun twice in the air. Ware further admitted that he had been convicted of drug trafficking.
Charles Brown, who also knew Dearing, testified that between 11:30 to 11:45 P.M., he was in the back parking lot of the East 156th Street Tavern, when he saw Dearing pull up in a blue Buick with a thirty-day tag in the rear window. Dearing stopped his car and they briefly exchanged words. Brown further testified that he had been convicted of possession of criminal tools and that he was under indictment for drug possession and for assault on a police officer. On cross-examination, he denied being promised leniency on his pending cases in exchange for his testimony in the instant case.
Also testifying for the state was Detective Lucey, who stated that the SB brand ammunition found at the crime scene and in Dearing's house, was manufactured in a foreign country and first came to the United States in 1992. He testified that he had only seen this brand twice.
The defense called one witness, John Knack, a firearms expert, who testified that a colored sealant on imported ammunition is common and a red color sealant is not unusual. He further testified that SB brand ammunition is not rare, as it is available through mail order and local distributors.
Following presentation of evidence and deliberation, the trial court found Dearing not guilty of aggravated murder, but guilty of the lesser included offense of murder, with a firearm specification, and also found him guilty of having a weapon while under a disability. The court thereafter imposed a three-year term for the firearm specification to be served prior to and consecutive with a sentence of fifteen years to life for murder, concurrent with a one-year term for having a weapon while under a disability.
Dearing now raises five assignments of error for our review, the first of which states:
 I. THE VIEW OF THE SCENE BY THE JUDGE IN THIS BENCH TRIAL LACKED CREDIBILITY WHERE THE SCENE WAS VIEWED IN BROAD DAYLIGHT, DID NOT FAIRLY DEPICT CONDITIONS AS TESTIFIED TO BY THE WITNESS, WHO COULD NOT IDENTIFY THE DEFENDANT, THEREBY VIOLATING DEFENDANT'S DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT.
Dearing argues that if the court had conducted a view of the crime scene under the exact same circumstances as when the crime occurred, it would have deemed Davis's eyewitness testimony unreliable. The state contends that a view of the scene is not statutorily required to duplicate the circumstances of the crime.
The issue then for our determination concerns whether the view of the scene as conducted by the trial court violated Dearing's due process rights.
R.C. 2945.16 provides in pertinent part:
2945.16 VIEW OF THE PREMISES
 When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court. * * *
Furthermore, 4 Ohio Jury Instructions (1993) 27, Section 402.50(2) addresses the view of scene:
 2.What you observe outside the courtroom is not evidence. (Conditions may have changed since the time of the events in this case.) The evidence of the physical appearance of the scene must come to you from the witness stand.
 The only purpose of your visit is to help you understand the evidence as it is presented in the courtroom. (Emphasis added.)
Here, in the absence of a jury, the court as a factfinder chose to view the scene and obviously knew the parameters and purpose for a view of the scene. It is not evidence. A daylight viewing of the crime scene from Davis' second floor apartment, therefore, comports with the statute affording the court discretion to view the premises. We are aware of no controlling legal authority that requires a view of the premises to duplicate the exact circumstances under which a crime occurred. We recognize that the jury instruction on the view of a scene contained in Ohio Jury Instructions informs the jury that the conditions of the scene may have changed since the time of the events at issue; doubtlessly, the trial court knew of the differences in circumstances when it viewed the scene in this case.
Furthermore, Dearing's claim that the trial court, acting as a factfinder, would have found Davis' eyewitness testimony unreliable were it to have viewed the scene at night is only speculative. Therefore, Dearing has not shown that the court violated his due process right by the manner in which it conducted the view of scene and we overrule this assignment of error.
II. THE PROSECUTOR'S MISCONDUCT VIOLATED MR.
 DEARING'S RIGHTS TO A FAIR TRIAL GUARANTEED BY THE DUE PROCESS PROVISIONS OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
Dearing alleges that the prosecutor deprived him of a fair trial because he asked Officer Legg an improper leading question, failed to disclose exculpatory materials including criminal records of various witnesses and the victim's family members, as well as plea bargains made to Charles Brown in exchange for testimony. Dearing also complains that the prosecutor made a series of improper prejudicial remarks in closing argument; placed a picture of the victim within the trial judge's view during trial; and presented evidence relating to the grocery store incidence and a prior charge of felonious assault in an attempt to introduce other crimes committed by Dearing.
The state contends that it did not disclose any plea bargain with Charles Brown because none existed, and further that it had no obligation to furnish criminal history of the victim's family because they were not called to testify.
The issue presented for our review thus concerns whether the prosecutor acted improperly to deprive Dearing of a fair trial.
A prosecuting attorney's conduct during trial does not constitute a ground for error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19.
A leading question is one which instructs [the] witness how to answer or puts into his mouth words to be echoed back. State v. D'Ambrosio, (1993), 67 Ohio St.3d 185, citing Black's Law Dictionary (6 Ed. Rev. 1990) 888.
Furthermore, the test regarding prosecutorial remark in closing argument is whether the remarks were improper, and if so, whether they prejudicially affected substantial rights of the defendant. See State v. Smith (1984), 14 Ohio St.3d 13. In addition, a prosecutor is entitled to a certain degree of latitude in closing argument. State v. Benge (1996),75 Ohio St.3d 136.
Here, Dearing alleges that the prosecutor improperly posed a leading question to Officer Legg on direct:
 Q. Officer, did you have the occasion how long have you worked in that district, again?
A. Four-and-half-years.
 Q. And have you had, during your experience, during this four-and-a-half years, had occurrence [sic] to hear the name Wet Daddy before?
A. On numerous occasions.
* * *
 Q. Can you tell the Court when you first heard of that name?
(Tr. 196.)
By referring to Wet Daddy, Dearing further contends, the prosecutor infused the question with a condemnation of his character and implied that he had a drug problem and a motive to kill. Our review of the trial transcript shows that this question merely directed the witness's attention to the topic of inquiry, namely, an individual known as Wet Daddy in the street. It did not instruct the witness how to answer the question or put into his mouth words to be echoed back. Therefore, the challenged question does not constitute an improper leading question. Furthermore, a fair reading of the record does not indicate that the prosecutor referred to Dearing's street name in an attempt to condemn his character or implied his drug use.
As to the prosecutor's alleged failure to furnish Dearing the criminal records of witnesses and the victim's family members, our review of the record indicates that the state, in response to Dearing's motion to demand discovery, made available a list of witnesses and their records of prior felony convictions for Dearing's inspection. Furthermore, the record doe not contain any complaints by Dearing prior to the commencement of trial as to any alleged failure by the prosecutor to comply with discovery request.
As to the prosecutor's alleged failure to supply the criminal record of the victim's family members, since none were called to testify, the state did not have any obligation to supply such information pursuant to Crim.R. 16(B).
Regarding the prosecutor's alleged failure to disclose plea bargains made with Charles Brown in exchange for his testimony, the trial transcript indicates that the defense counsel questioned Brown repeatedly on cross-examination as to the existence of any promises made in exchange for his testimony, and Brown denied that the state had made any promise of leniency.
Dearing also complains that the prosecutor made improper remarks during closing argument — in particular, he commented that the state's expert witness was more credible than the defense expert; injected his own opinion on Dearing's statement explaining his flight from the police when approached; stated that no promise of leniency had been made to Charles Brown; and, remarked that this weapon and the bullets match up despite that no gun had been found. Each of these challenged remarks is well within the latitude a prosecutor is entitled to in closing argument and we fail to perceive any impropriety.
As to the placement of the victim's picture within the trial court's sight, the record indicates that the court admonished the prosecutor as to its impropriety and ordered the picture removed before the trial continued.
As to Dearing's final claim of prosecutorial misconduct within this assignment of error, we point out that the introduction of evidence relating to the grocery store incident and a prior charge of felonious assault does not raise an issue of prosecutorial misconduct; admission of evidence lies within the sound discretion of the trial court.
Because Dearing has not established any improper conduct of the prosecutor which had deprived Dearing of a fair trial, we overrule this assignment of error.
Dearing's third assignment of error states:
 III. DEFENDANT WAS DENIED A FAIR AND JUST TRIAL GUARANTEED BY DUE PROCESS PROVISIONS OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE DOES NOT SUPPORT A CONVICTION OF THE APPELLANT.
Dearing contends that the state presented insufficient evidence to support his conviction and that his conviction is against the manifest weight of the evidence. The state counters that Dearing's guilt is supported by sufficient evidence and not against the manifest weight of the evidence. The issues then presented for review concern whether sufficient evidence supported Dearing's guilt and whether the conviction is against the manifest weight of the evidence.
As to the claim of insufficient evidence, Crim.R. 29(A) states, in relevant part:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.
The test for sufficiency raises a question of law to be decided by the court before the jury may receive and consider the claimed offense. In State v. Martin (1983), 20 Ohio App.3d 172, the court summarizes the standard of review for an insufficiency claim:
 * * * [T]he test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process.
 It raises a question of law, the resolution of which does not allow the court to weigh the evidence. (Citations omitted.)
In State v. Jenks (1991), 61 Ohio St.3d 259, the Supreme Court of Ohio stresses the equal weight to be given to circumstantial evidence:
 Likewise, we have stated that * * * proof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others.
Here, the record indicates that a witness observed the driver of a 1989 blue Buick Skylark with a temporary tag in the center of the rear window exit the car and fire several shots which killed Jackson. Two additional witnesses saw, within an hour of the shooting, Dearing drive a blue Buick Skylark with a temporary tag in the rear window, in the general vicinity of where the shooting occurred. The record further reflects that the next day an officer saw Dearing driving a blue Skylark with a temporary tag in the center of the rear window, the vehicle registered in his name. Because no one else had driven his car on the evening of the shooting according to Dearing's own statements, the eyewitness accounts established him as the driver of the blue Buick Skylark around midnight on January 1, 2000, who had been observed firing the fatal shots. This evidence is further coupled with the SB brand nine millimeter short ammunition with a red-colored sealer, shells of which were found near the victim and live rounds of which were located at Dearing's residence. After viewing the probative evidence and inferences reasonably drawn therefrom in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found all the essential elements of murder beyond a reasonable doubt.
Only after the court resolves the question concerning the sufficiency of the evidence, can it proceed to review whether the judgment is against the manifest weight of the evidence. This involves a different test. In Martin, the court reiterates the standard of review for a manifest-weight claim:
 * * * We next consider the claim that the judgment was against the manifest weight of the evidence. Here the test is much broader.
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
Here, the record indicates that eyewitnesses placed Dearing driving his blue Buick Skylark in the area where the crime occurred close to midnight of the New Year's Eve, and an eyewitness saw the driver of this particular car fire the shots that killed Jackson. Although Dearing questioned the credibility of some of the witnesses due to their criminal records, we note that the key eyewitness who observed the shooting is not tainted by any criminal record, and that other witnesses had been questioned at trial on their criminal record and existence of any bargains with the prosecutor. Furthermore, we note that the trial court viewed the crime scene from where the key eyewitness was located at the time of the shooting to ensure the reliability of his eyewitness account. Therefore, after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we are not persuaded that the trial court clearly lost its way and created such a manifest miscarriage of justice that Dearing's conviction must be reversed and a new trial ordered. We do not believe that the instant case is such an exceptional case where the evidence weighs heavily against the conviction, thus warranting the exercise of our discretion to grant a new trial.
Accordingly, we overrule this assignment of error.
Dearing's fourth assignment of error states:
 MR. DEARING WAS DENIED HIS RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN HIS COUNSEL PERMITTED TO SIGN A JURY WAIVER WITHOUT A DETERMINATION OF COMPETENCY TO STAND TRIAL; BY THE FAILURE OF COUNSEL TO FILE ANY MOTIONS TO SUPPRESS, THEREBY DENYING APPELLANT THE RIGHT TO PRESENT AN EFFECTIVE DEFENSE AND CONFRONT THE WITNESSES AS TO BIAS, PREJUDICE AND CREDIBILITY.
Dearing claims that his counsel failed to request a competency hearing prior to his waiver of right to a jury trial; did not file motions to suppress evidence obtained from allegedly unlawful search of his vehicle and his statements allegedly taken in violation of his Miranda rights; failed to present additional witnesses, including himself, to testify on his behalf; and failed to investigate the criminal records of three state witnesses for impeachment purposes. The state contends that all these claims are without merit.
The issue then concerns whether Dearing had been deprived of a fair trial by ineffective assistance of counsel.
To sustain his claim that his counsel had been ineffective, a defendant must demonstrate that trial counsel's performance fell below the objective standard of reasonable competence under the circumstances, and that, but for such deficiency, the outcome of the trial would have been different. See Strickland v. Washington (1984), 466 U.S. 668; State v. Bradley (1989), 42 Ohio St.3d 136. Furthermore, strategic or tactical decisions made by defense counsel which are well within the range of professionally reasonable judgment need not be analyzed by a reviewing court. Strickland, supra.
We consider first the trial counsel's alleged failure to request a competency hearing prior to the jury trial waiver.
R.C. 2945.37(B) provides:
 In a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion.
The test to determine whether a defendant is competent to stand trial "must be whether he has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." State v. Berry (1995), 72 Ohio St.3d 354, 359. Furthermore, "[t]he right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains `sufficient indicia of incompetence,'such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." Id. Finally, mental illness does not necessarily equate with legal incompetency. Id. at 362.
Here, the journal entry filed on July 19, 2000 reflects that Dearing executed a written jury trial waiver, that he also orally waived his rights to a jury trial in court, and that the court found that he knowingly, intelligently and voluntarily waived such rights. The record further indicates that the issue of Dearing's mental competency was raised for the very first time, after trial, at a July 21, 2000 proceeding, where the defense counsel requested to withdraw from representation of Dearing. At this proceeding, Dearing's bellicose remarks in court prompted the court to order a competency report and continued the proceeding. On September 18, 2000, the sentencing hearing proceeded, and the record reflects that the court and the parties discussed the competency report, where Dr. Parker opined that although Dearing suffered from severe psychosis and paranoid schizophrenia, he was in remission at the time. Upon the defense counsel's request for further evaluation, the court stated the following:
 Let me note several things in response to this issue [of competency to stand trial].
 First, * * *, this issue was not raised prior to the trial, and that during the course of the trial, I certainly would have made a point, counsel probably would have noted something, raised the question, and I would have raised it if they didn't, if there were any apparent signs that the Defendant either didn't understand or was unable to participate in the proceedings. I did not nothing was brought to my attention or appeared to me.
 Next, I think it would probably be impossible for any professional to go back into history and determine whether, at a previous time, and individual was competent to stand trial, unless there were some obvious signs; outbursts during trial or comments that were on the record.
In addition, we note that on appeal Dearing claims that he was surprised by the defense his counsel presented; that he expected more than one person testifying on his behalf, particularly witnesses as to his whereabouts at the time of Regina Jackson's death; that he was under the impression that his girlfriend, mother and a private investigator would be testifying to these matters as well as to the credibility and bias of the witnesses against him. (Appellant's Brief at 31.) The record further reflects that Dearing filed a motion for new trial, pro se, on August 4, 2000.
Therefore, our review of the record does not reflect that Dearing did not possess sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, or that he lacked a rational or factual understanding of the proceedings against him, either prior to or during trial. Because the record does not contain sufficient indicia of incompetence that would have warranted his trial counsel's inquiry into his competency to ensure his right to a fair trial, we are not persuaded that the counsel's conduct regarding the issue of his alleged incompetence had been deficient under the circumstances.
Dearing also alleges on appeal that his trial counsel failed to file any motions to suppress evidence challenging the search of his vehicle or statements he made to the police. Dearing, however, does not elaborate for our review the particular evidence or statements he claims his counsel should have sought to suppress; nor does he point to anything on the record that would have warranted requests by his counsel to suppress evidence. Consequently, we are unable to review this claim of ineffective assistance of counsel.
Furthermore, Dearing claims that his counsel should have called various witnesses, including himself, to testify on his behalf, regarding his whereabouts at the time of the shooting. The record contains testimony by the police who had interviewed him that Dearing gave varying accounts in this connection. Given the state of the record, we conclude that the defense counsel's decision not to call witnesses to testify as to alibi is a strategic or tactical decision made within the range of professionally reasonable judgment and need not be analyzed.
Finally, Dearing alleges that his counsel failed to investigate the criminal records of three state witnesses for impeachment purposes. The record shows that the witnesses were questioned on their criminal record or plea bargains made with the prosecutor. We conclude therefore that the alleged deficiency in failing to investigate the witnesses's criminal history would not have caused a different outcome of the trial.
Because Dearing fails to demonstrate that the counsel's performance was deficient and that but for the deficient conduct, the outcome of the trial would have been different, we overrule this assignment of error.
Dearing's fifth assignment of error states:
 V. THE COURT DENIED THE APPELLANT A FAIR TRIAL BY NOT COMPELLING THE STATE TO RESPOND TO REPEATED REQUESTS FOR FULL DISCOVERY, INCLUDING ANY PROSECUTORIAL PLEA BARGAINS, FAILING TO GRANT A NEW TRIAL IN LIGHT OF THE ISSUE OF DEFENDANT'S INCOMPETENCY WHICH CAME TO THE ATTENTION OF THE COURT PRIOR TO THE TIME OF SENTENCING.
Dearing contends that the trial court denied him a fair trial by not compelling the state to respond to his requests for discovery relating to any prosecutorial plea bargain and by not granting him a new trial based on the issue of his competency to stand trial.
Here, the record reflects that prior to opening argument, the court made inquiry into to the existence of any motions that remained to be resolved before the commencement of trial. In response, defense counsel orally moved for separation of witnesses, but did not raise any issues regarding the state's failure to comply with discovery requests that Dearing now alleges. (Tr. 6.) Thus, the record does not reflect that the trial court had deprived Dearing of a fair trial by failing to compel the state to comply with the defendant's discovery requests.
As to the trial court's alleged error in failing to grant him a new trial due to his alleged incompetence, the record reflects that Dearing filed a motion for a new trial, pro se, on August 4, 2000 alleging that the verdict was not sustained by sufficient evidence; that new evidence material to the defense was discovered which the defendant could not with reasonable diligence have discovered and produced at trial; that he received ineffective assistance of counsel; and that the court failed to grant an evidentiary hearing on his motion to suppress. In addition, on August 7, 2000, his counsel filed another motion for a new trial, on the ground of insufficient evidence to support the conviction. Neither he nor his counsel raised the issue of competency to stand trial as a ground for the request of a new trial. More importantly, we have determined that the record, as it stands, does not contain sufficient indicia of Dearing's incompetence during trial. Thus, Dearing fails to establish that the trial court erred in not granting his motions for a new trial, or that it erred in not ordering a new trial, sua sponte, on the ground of Dearing's alleged lack of competence to stand trial.
The state of the record therefore does not indicate that the court denied Dearing a fair trial, and we overrule this assignment of error.
On the basis of the foregoing, we affirm the judgment of the trial court.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANNE L. KILBANE, P.J., and JAMES J. SWEENEY, J., CONCUR